# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF GEORGIA
## ATLANTA DIVISION

Anthony Daniel, et al.,

                    Plaintiffs,      Case No. 1:16-cv-03512

v.                           Michael L. Brown
                                United States District Judge

Georgia Department of Human
Services, et al.,

                    Defendants.

_____/

## OPINION & ORDER

This is a heartbreaking case. Laila Daniel died at the age of two after the State of Georgia placed her in the custody of Jennifer and Joseph Rosenbaum. Her parents, Anthony Daniel and Tessa Clendening, sued the Georgia Department of Human Services ("DHS") and Samantha White and Tamara Warner, former DHS case workers responsible for Laila's placement with the Rosenbaums. Defendants White and Warner moved for summary judgment. (Dkts. 41; 43.) Defendant DHS also moved to dismiss or for summary judgment. (Dkt. 44.) The Court grants Defendants White's and Warner's Motions for Summary Judgment

(Dkts. 41; 43).  The Court grants in part and denies in part Defendant DHS's Motion to Dismiss or for Summary Judgment (Dkt. 44).

## I.    Background

DHS's Division of Family and Child Services ("DFCS") took Laila Daniel and her sister, MP, into its temporary legal and physical custody in April 2015.  (Dkt. 37 ¶ 12.)  Laila was about twenty-one months old at the time.  (*Id.*)  MP was four.  (*Id.*)  DFCS placed the girls with Patricia and Dexter Lambert, experienced foster parents.  (*Id.* ¶¶ 14, 15.)[1]

Jennifer Rosenbaum was a third-year law student interning in the Juvenile Court in Henry County.  (*Id.* ¶ 17.)  She heard about the children's placement in foster care.  (*Id.*)  Rosenbaum had been a foster child and had lived in a foster home with the children's mother.  (*Id.*)  Jennifer and her husband, Joseph Rosenbaum, wanted to provide foster care for Laila and MP.  (*Id.*)

---

[1] Defendant Warner spends several pages of her brief explaining what bad parents Plaintiffs were to Laila and MP, including arrests, drug abuse, neglect of the children, and failure to contact their children after DFCS took them into custody.  (Dkt. 41-1 at 2–4.)  That is irrelevant. This case involves Laila's fundamental right to physical safety while in DFCS custody.  Laila had that right no matter her parents' failures.

Defendant White, the children's case manager, heard about their interest. (*Id.* ¶ 4; Dkt. 42-1 at 71:11–21.) Because the Rosenbaums were not approved foster parents, White and her supervisor, Defendant Warner, worked to have them approved as "fictive kin." (Dkt. 37 ¶ 18.) Fictive kin is a term DFCS uses to describe people who are so close to children that DFCS considers them relatives even though they are not actually related. (Dkt. 42-2 at 52:3–54:11.) DFCS treats placement with fictive kin as placement with relatives. (Dkt. 42-2 at 50:1–11.) It is not foster parent placement. (*Id.*) Fictive kin are supposed to have resided with or had significant contact with the children before becoming permanent caregivers. (Dkt. 44-2 at 8.) That was not the case here. The record provides little detail about the decision to classify the Rosenbaums as fictive kin other than to say that Warner believed they would serve as good caregivers for the children. She explained, "when you work with youth and understand services that are put in place, [Jennifer Rosenbaum] would have been what we called an ideal person that went through the system. She would have been what we considered rehabilitated. She was a pillar of the community." (Dkt. 41-1 at 73:19–23.)

As a part of the approval process, DFCS hired a company to perform a background check on the Rosenbaums. (*See* Dkt. 41-3 at 36–57.) The company gave them positive reviews and approved Laila and MP going into their home. (*Id.*) White and Warner did not conduct a check under Jennifer Rosenbaum's maiden name, which would have revealed that she had been in foster care. (Dkt. 42-2 at 74:11–17.) They knew she had been in foster care, but that was all. (*Id.*) Warner explained that, because she viewed Jennifer Rosenbaum as someone who had pulled herself out of a difficult situation, she did not look further into her past. (Dkt. 42-2 at 75:14–20.)

The Rosenbaums moved forward in their efforts to take custody of the girls. As part of this, Laila and MP (while still living with the Lamberts) visited the Rosenbaums for overnight stays. (Dkt. 42-1 at 84:8–14.) Ms. Lambert expressed concern to Warner that the Rosenbaums were not watching the children closely enough. (*Id.* at 84:15–85:9.) Ms. Lambert went to the DFCS office twice to voice her concerns. (Dkt. 42-2 at 18:4–20:8.) During one visit, she showed a different case manager a bruise on Laila's leg and let the case manager take photos of the injury. (*Id.*) She explained that Jennifer Rosenbaum

had said Laila got the bruise during an altercation with another child. (Dkt. 37 ¶ 21.)[2]  Warner saw the photos of the bruise and sent White to see the children at the Lamberts' house.  (Dkt. 42-2 at 18:4–20:8.)  White met with the children, took additional photographs, and reported back that the injury was "pretty much gone."  (*Id.;* Dkt. 50-5 at 1.)  White told Warner she had no concerns and did not feel the children were in any danger.  (Dkt. 42-2 at 18:4–20:8.)[3]

White also met with Jennifer Rosenbaum.  She told Rosenbaum that someone had reported concerns about whether she was watching the children closely enough.  (Dkt. 42-1 at 87:11–13.)  White thought Rosenbaum "didn't take it the wrong way" and Rosenbaum "took [her]

---

[2] The parties disagree about whether Laila had a bruise or a scratch. Plaintiffs say it was a bruise and cite a (partially redacted) Log of Contact Narrative. (Dkts. 49-1 ¶ 13; 50-5 at 1.)  Defendant Warner testified that it looked like a scratch.  (Dkt. 42-2 at 69:10–12.)  The Court, giving Plaintiff the benefit of all disputes, considers the injury as a bruise. Whatever the terminology, Defendant Warner testified that she did not consider it a serious injury, and Plaintiffs have introduced no evidence to challenge that conclusion.

[3] Ms. Lambert reported that White did not undress Laila on this visit. (Dkt. 50-5 at 1.)  Warner had expected White to do so.  (Dkt. 42-2 at 71:15–19.)  She did not learn of White's failure to follow DFCS policy until after Laila's death.  (*Id.* at 71:20–24.)  She was shocked.  (*Id.* at 71:25–72:5.)

advice." (*Id.* at 87:14–18.) After investigating Ms. Lambert's complaint about the bruise, White found nothing of concern. (Dkt. 42-2 at 18:4–20:8.) Warner and White did not file a Serious Injury Report or a Child Protective Services Report about the injury because they did not think it was serious.[4] (Dkt. 37 ¶ 28.) Ms. Lambert also never said that the Rosenbaums should not get the children. (Dkt. 42-1 at 19–22.)

Both White and Warner approved of the Rosenbaums taking the children as fictive kin. (Dkt. 42-2 at 50:1–16.) Warner instructed White to get approval for this decision from their administrator. (Dkt. 42-2 at 49:19–50:17.) White never did so, and Warner failed to follow up. (Dkt. 42-2 at 50:1–16.) DFCS permanently assigned Laila and MP to the Rosenbaums in late July 2015. (Dkt. 37 ¶ 21.)

As case manager, White visited the Rosenbaums each month. (Dkt. 43-4 ¶ 10.) She typically (but not always) undressed Laila to examine

---

[4] DHA workers complete Child Protective Services Reports when they have concerns about abuse or neglect. (Dkt. 42-2 at 54 (55) 3–4.) Serious Injury Reports are completed when an official supervising a foster child subjectively believes (or has a subjective belief that) a foster child has been abused or neglected. (Dkt. 73 at 9–21.)

her for injuries or signs of abuse.[5]  (*Id.*; Dkt. 42-1 at 60:20–61:19.)  White did not undress MP because she was older and could speak with White about her treatment.  (Dkt. 43-4 ¶ 10.)  MP told White that the Rosenbaums never hurt her or her sister.  (Dkt. 42-1 at 63:6–64:8.)

During a visit in early September 2015, White found a bruise on Laila.  (Dkt. 42-1 at 109:17–110:5.)  Jennifer Rosenbaum said another child at daycare had hit Laila.  (*Id.*)  White contacted the school and confirmed that Laila had been at school.  (*Id.* at 110:16–25.)  After this visit, White wrote in a DFCS narrative that "the girls are doing well… [MP] does not have any marks or bruises on her body.  Laila has a small bruise on her right wrist… There were no other marks or bruising on her body."  (Dkt. 41-2 ¶ 36.)

The next month, Laila broke her leg.  (Dkt. 37 ¶ 30.)  Jennifer Rosenbaum took her to an urgent care facility.  (Dkt. 42-1 at 46:18–47:5.)  Medical records show Rosenbaum claimed Laila had fallen at her "Nana's house" and at a gymnastics class.  (Dkt. 37 ¶ 31.)  Jennifer Rosenbaum texted White while at the hospital, saying Laila had hurt her leg at

---

[5] Plaintiffs argue White never undressed Laila, but Plaintiffs do not point to anywhere in the record that contradicts White's testimony that she undressed Laila on other visits.

gymnastics, that they were at the hospital with the doctor, and that Laila was not in much pain. (Dkt. 42-1 at 46:2–48:17.) White spoke with Laila's doctor, who said Laila would be okay. (*Id.* at 53:8–24.) The doctor did not mention any concerns of abuse. (Dkt. 43-4 ¶ 8.) White also arranged to get the doctor's notes. (Dkt. 42-1 at 48:6-12.) She had given the Rosenbaums permission to take the girls to gymnastics but she did not go to the gymnasium until after Laila's leg injury and she failed to check out Jennifer Rosenbaum's explanation for the injury. (Dkt. 42-1 at 46:8–17, 47:2–14, 99:16-25.)[6]

White claims she told Warner about the injury, but Warner denies that. (Dkt. 41-2 ¶ 27.) Given that Laila broke her leg, White should have completed a Serious Injury Report. (Dkt. 73 at 19:16–20:13.) The parties dispute whether she did so. Warner stopped supervising White on November 1, 2015, and had no further involvement with Laila's case. (Dkt. 41-2 ¶ 30.)

White visited the Rosenbaums on November 2, 2015. (Dkt. 37 ¶ 38.) She saw a bruise on MP's head. (*Id.*) Jennifer Rosenbaum explained that

---

[6] After Laila's death, DHS learned that Jennifer Rosenbaum had not enrolled Laila in gymnastics class. (*See* Dkts. 42-1 at 99:18–24; 37 ¶ 35.)

she had left MP in the bathroom alone while retrieving her phone from another room. (Dkt. 43-4 ¶ 6.) She said that, while she was gone, MP bumped her head against the faucet.[7] (*Id.*) Laila was asleep during the visit. (Dkt. 42-1 at 65:4–18.) Rosenbaum told White that Laila was teething and having trouble sleeping. (*Id.*) As a result, White did not wake the child to undress her. (*Id.*) Instead, she merely pulled back the bed covers and looked over the child's body for signs of abuse. (*Id.*) She found none. (*Id.*) White recorded her impressions of this incident:

> There are no signs of maltreatment . . . . [MP] hit her head on the facet (sic) in the tub . . . . There is not any serious bruising. [White] asked [MP] if she was ok and she stated that she was and that it didn't hurt . . . . There are no other marks on the girl[']s bodies . . . . There are no safety interventions needed. The girls are closely watched and when medical attention is needed it is given quickly.

(Dkt. 41-2 ¶ 37.)

Laila passed away on November 17, 2015. (Dkt. 37 ¶ 1.) An autopsy revealed she had an untreated broken arm and multiple bruises over her entire body. (*Id.* at ¶ 42.) A medical examiner testified at Jennifer Rosenbaum's criminal trial that Laila endured ongoing abuse,

---

[7] In discovery, Plaintiffs referred to the injury as a black eye while White referred to it as a mark under her eye. (Dkts. 50 ¶ 35; 42-1 at 102:20–21.)

including twenty-two injuries to the head and neck, eleven injuries to the torso, and multiple injuries to her legs. (*See* Dkt. 74 ¶ 2.) DFCS Director Bobby Cagle fired White and Warner after an internal DHS investigation into their conduct. (Dkt. 73 at 23:22–24:15.)

Plaintiffs filed claims under 42 U.S.C. § 1983 against Defendants Warner and White for violating Laila's substantive and procedural due process rights under the Fourteenth Amendment to physical safety while in DFCS custody. They also sued Defendant DHS for the negligence of White and Warner in placing Laila with the Rosenbaums and for the negligence of Jennifer Rosenbaum in killing the girl. Defendants moved for summary judgment or otherwise to dismiss the claims.

## II.    Standard of Review

Rule 56 of the Federal Rules of Civil Procedure provides that a court "shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a). A factual dispute is genuine if the evidence would allow a reasonable jury to find for the nonmoving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A fact is "material" if it is "a legal element of the claim under the

applicable substantive law which might affect the outcome of the case."
*Allen v. Tyson Foods, Inc.*, 121 F.3d 642, 646 (11th Cir. 1997).

The party moving for summary judgment bears the initial burden of showing a court, by reference to materials in the record, that there is no genuine dispute as to any material fact. *Hickson Corp. v. N. Crossarm Co.*, 357 F.3d 1256, 1260 (11th Cir. 2004) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986)). A moving party does this by showing "an absence of evidence to support the nonmoving party's case." *Celotex*, 477 U.S. at 325. The movant, however, need not negate the other party's claim. *Id.* at 323. It simply must show a lack of dispute as to a material fact. In determining whether a movant has done this, the court views the evidence and all factual inferences in the light most favorable to the party opposing the motion. *Johnson v. Clifton*, 74 F.3d 1087, 1090 (11th Cir. 1996).

If the movant meets its burden, the nonmovant must show that summary judgment is improper by identifying specific evidence that raise a genuine dispute as to a material fact. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). Ultimately, there is no "genuine [dispute] for trial" when the record as a whole could not lead a

rational trier of fact to find for the nonmoving party. *Id.* But "the mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact." *Anderson*, 477 U.S. at 247–48. The court, however, resolves all reasonable doubts in the favor of the non-movant. *Fitzpatrick v. City of Atlanta*, 2 F.3d 1112, 1115 (11th Cir. 1993).

## III. Analysis

### A. Defendants White's and Warner's Motions for Summary Judgment

Plaintiffs sued Defendants White and Warner under 42 U.S.C. § 1983 claiming they violated Laila's substantive constitutional right to physical safety as a dependent child (Count 3). They also brought § 1983 claims against White and Warner for violating their daughter's right to procedural due process under the Fourteenth Amendment (Count 4).

#### 1. Substantive Due Process Claims

Plaintiffs allege Defendants White and Warner acted with deliberate indifference when they recklessly placed Laila with the Rosenbaums and disregarded subsequent evidence the Rosenbaums were abusing her. They claim White's and Warner's deliberate indifference led

to their daughter's death. White and Warner claim they are entitled to qualified immunity. *See Maldonado v. Snead*, 168 F. App'x 373, 379 (11th Cir. 2006). To determine whether an state officer has qualified immunity, a court asks if the defendant has violated the plaintiff's constitutional rights and if those constitutional rights were clearly established at the time. *See Omar v. Lindsey*, 243 F. Supp. 2d 1339, 1343 (11th Cir. 2003).

When a state takes a child into its custody, it accepts responsibility for the child's safety. *Ray v. Foltz*, 370 F.3d 1079, 1082 (11th Cir. 2004) (citing *Taylor v. Ledbetter*, 818 F.2d 791, 794–95 (11th Cir. 1987)). It is clearly established that "foster children have a constitutional right to be free from unnecessary pain and a fundamental right to physical safety." *Id.* When a state fails to meet that obligation, it deprives the child of a liberty interest under the Fourteenth Amendment. *Id.* The undisputed evidence here shows that Defendant DHS placed Laila in an unsafe and life threatening situation, placing her with people who abused her to the point of death. The facts demonstrate a clear violation of Laila's well-established constitutional rights.

But that is not enough for her parents to recover against Defendants White and Warner. The Eleventh Circuit has explained that foster care officials are protected from liability unless they were deliberately indifferent to the violation of a child's right to safety. *See Taylor*, 818 F.2d at 797; *see also Nichols v. Maynard*, 204 F. App'x 826, 828 (11th Cir. 2006) ("Defendants are not entitled to qualified immunity if they were deliberately indifferent to [the foster child's] right to physical safety.")

Deliberate indifference is a difficult standard — "[it] is not the same thing as negligence or carelessness. On the contrary, the Supreme Court has made clear that a state official acts with deliberate indifference only when he [or she] disregards a risk of harm of which he [or she] is *actually aware*." *Ray*, 370 F.3d at 1083 (citations omitted). The test for deliberate indifference is not objective (asking what a reasonable person would know); it is subjective (asking what the official actually knew). *Maldonado*, 168 F. App'x at 379. "To be deliberately indifferent, an official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw that inference." *Id.* (internal quotation marks omitted). A plaintiff

seeking to recover from a foster care official thus must show a defendant "(1) was objectively aware of a serious risk of harm; (2) recklessly disregarded the risk of harm; and (3) this conduct was more than merely negligent." *Ray*, 370 F.3d at 1083 (citing *McElligott v. Foley*, 182 F.3d 1248, 1255 (11th Cir. 1999)). The Eleventh Circuit has repeatedly cautioned that, to recover from a foster care official for abuse by a foster care parent, a plaintiff "will be faced with the difficult problem of showing actual knowledge of abuse or that agency personnel deliberately failed to learn what was occurring in the foster home." *Maldonado*, 168 F. App'x at 379 (quoting *Taylor*, 818 F.2d at 796).

Plaintiffs have not presented evidence from which a jury could find Defendant White had actual knowledge or deliberately failed to learn of the serious risk to Laila from the Rosenbaums. They claim White inadequately vetted the Rosenbaums as fictive kin and succumbed to pressure to approve the Rosenbaums as fictive kin even though they did not qualify for that status. The record, however, does not support this allegation. Indeed, the record is unclear on White's role in approving the Rosenbaums. (*See* Dkt. 42-1 at 91:4–25, 94:8–16.) An outside company vetted the Rosenbaums, and even if White had a decisive role (which the

Court assumes), reliance on the outside company's evaluation would not have been a deliberate failure to learn of a serious risk of harm to Laila and MP. *See also Ray*, 370 F.3d at 1084 (finding failure to screen adequately prospective foster parents "at most" negligent and not deliberate indifference).

Plaintiffs present no evidence that any failure to follow necessary protocol or apply the fictive kin standard more narrowly provided White any reason to believe the Rosenbaums posed a danger to Laila. Even if she was negligent or careless in relying on the outside company and appointing the Rosenbaums as Laila's fictive kin, her negligence or carelessness would not defeat qualified immunity.

Plaintiffs next claim deliberate indifference can be inferred from evidence that White ignored Ms. Lambert's warning about the Rosenbaums after Ms. Lambert found a bruise on Laila's leg following a pre-placement visit with the Rosenbaums. The undisputed evidence, however, shows White did ***not*** ignore Ms. Lambert's warning. White investigated the incident, speaking with Jennifer Rosenbaum, seeing the children, and looking at the injury. (Dkt. 42-1 at 87:1–22.) White

concluded it was not serious.[8]  Ms. Lambert also did not suggest that the Rosenbaums might abuse or hurt Laila and her sister.  She  said only that the Rosenbaums might not be watching them closely enough.  (Dkts. 42-1 at 84:15–85:9; 42-2 at 20:17–22.)  Ms. Lambert's warning and White's response provide no evidence that White had actual knowledge of any risk of harm to Laila from physical abuse by the Rosenbaums.  It also provides no evidence White deliberately failed to learn of that abuse.

Plaintiffs also claim White failed to respond properly to injuries Laila and MP sustained while in the Rosenbaum's care — Laila's broken leg and MP's black eye.[9]  Plaintiffs presented no evidence from either event to establish a genuine issue of fact suggesting White knew of a risk of serious harm to Laila or "deliberately failed to learn what was going on in the [Rosenbaums'] home." *Maldonado*, 168 F. App'x at 379.   In

---

[8] Ms. Lambert also complained that White did not undress the children, a DFCS policy.  (Dkt. 50-5 at 1.)  But the failure to undress the children does not amount to deliberate indifference. *See Omar v. Babcock*, 177 F. App'x 59, 64 (finding failure to perform a mandated home visit was not deliberate indifference).

[9] There is also the incident from September 2015, when White saw a bruise on Laila.  The parties agree this injury happened while Laila was at daycare.  (Dkt. 49-2 ¶ 41.)  White confirmed with the school that Laila and MP had been at the school.  (Dkt. 42-1 at 109:16–25.)

*Maldonado v. Snead*, a foster parent took her child to a hospital with a cut under her eye. *Id.* at 384. The doctor closed the wound with three stitches. (*Id.*) The foster parent claimed she did not know how the child had been hurt but said maybe she cut herself while playing with a toy. *Id.* Later, the plaintiffs alleged the child had been stabbed by the foster parent and her case workers knew of the abuse or deliberately failed to learn of it. *Id.* The Eleventh Circuit found that relying on the foster parent's statement about the injury did not give the case worker knowledge of abuse. *Id.*

Here too, White relied on plausible explanations for both injuries. The undisputed evidence shows that Jennifer Rosenbaum called White when Laila suffered the broken leg. She reported that Laila had been injured at gymnastics. (Dkt. 42-1 at 48:25–49:3.) At the time, White knew she had given the Rosenbaums permission to take Laila and MP to gymnastics. She also knew Jennifer Rosenbaum had sought medical care twice for the same injury, first at the hospital and then at the urgent care facility — thus showing concern for the girl. After learning of the injury, White spoke to Laila's doctor, who said Laila would fully recover. (Dkt. 43-4 ¶ 3.) White specifically asked the doctor whether Laila had any

signs of abuse. (*Id.*) The doctor said she did not. (*Id.*) White also confirmed that Laila had scheduled follow-up appointments. (Dkt. 42-1 at 52:15–24.)

Similarly, Rosenbaum told White that MP had gotten the black eye when she bumped her head on the faucet while taking a bath. Nothing in the record shows this explanation was false, that White thought it was false, or that White suspected abuse. This undisputed evidence shows that White neither new of a risk of serious harm to Laila (or MP) nor "deliberately failed to learn what was occurring in the foster home." *Maldonado*, 168 F. App'x at 379.

Plaintiffs also claim White's failure to file a Serious Injury Report after Laila broke her leg amounted to deliberate indifference. As explained above, the parties dispute whether White filed that report. But, assuming she did not, that failure alone does not amount to deliberate indifference. *See Babcock*, 177 F. App'x at 64 ("[M]ere failure to follow DCF policy by gathering certain information does not rise to the level of deliberate indifference.").

Likewise evidence that White did not undress Laila to check for signs of abuse during at least two home visits cannot establish a claim

against White.  While she should have undressed Laila during the pre-placement visit, her failure to do so does not indicate that she knew of any threat to Laila.  At the time, the girl was still living with the Lamberts.  They were the ones who noticed the scratch or bruise on the girl's leg.  White's failure to undress the girl thus does not suggest White was deliberately trying to avoid knowing how the Rosembaums were treating Laila.

White admits that she failed to undress Laila during the November 2, 2015, visit because Jennifer Rosenbaum said the girl was teething and having trouble sleeping.  She insists that she undressed Laila on every other visit.  Plaintiffs present no evidence to dispute White's claim.[10] Accepting the undisputed evidence as true, White did not have actual knowledge of a serious risk of abuse from her failure to undress Laila on this visit.  Indeed, she recorded her observations from the visit, saying,

---

[10] Plaintiffs claim the Court should, for this order, assume White did not undress Laila on other visits.  Plaintiffs, however, have not pointed to any evidence in the record that would rebut White's testimony that she undressed Laila on other visits.  The Court thus proceeds with the understanding that White undressed Laila on other visits.  *See* LR 56.1B(2), NDGa  ("This Court will deem each of the movant's facts as admitted unless the respondent: [ ] directly refutes the movant's fact with concise responses supported by specific citations to evidence . . . .).

"[t]here are no signs of maltreatment. . . . The girls are closely watched and when medical attention is needed it is given quickly." (Dkt. 41-2 ¶ 37.) White also did not deliberately fail to learn what was going on in the house. White interviewed MP, who said nothing to give White a suspicion that abuse was happening. White then checked Laila as she was sleeping. The DFCS policy mandated undressing Laila, and the failure to do so may have been negligent, but the failure to follow this policy was not deliberate indifference. *See Babcock*, 177 F. App'x at 64.

None of these events (either individually or collectively) provide a material fact from which a jury could conclude that Defendant White knew (or intentionally failed to know) the Rosenbaums might abuse Laila. Plaintiffs introduce no evidence suggesting White recklessly disregarded a known risk that the Rosenbaums might abuse the child. Jennifer Rosenbaum gave White plausible explanations for each incident. White questioned MP every time she visited the residence, and each time MP said nothing that created suspicions for her. See *Babcock*, 177 F. App'x at 64 (foster care adoption counselor's regular contact and familiarity with the foster home showed that the foster care adoption counselor was not deliberately indifferent). White failed to see the signs

of abuse, with tragic and heartbreaking results. She may have been negligent, careless, or lazy. But she was not deliberately indifferent.

Plaintiffs make the same arguments in support of their substantive due process claims against Warner. They fail for the same reasons. First, Warner was not deliberately indifferent in approving the Rosenbaums as fictive kin. Warner hired an outside agency that approved the Rosenbaums after conducting a background check. Warner did not investigate her experiences as a foster child as she should have done, but not following a specific procedure does not amount to deliberate indifference. *See Babcock*, 177 F. App'x at 64. The undisputed evidence shows that Warner believed Jennifer Rosenbaum to be a success story and a good candidate to raise the girls. Second, Warner did not ignore Ms. Lambert's warning. She sent White to talk to the children and to talk to the Rosenbaums. White reported back that she did not have any concerns and relying on White's assessment was not deliberately indifferent.

Third, the failure to file a Serious Injury Report when Laila broke her leg was not deliberate indifference. White's later investigation of the broken leg, over which Warner would have supervisory authority, shows

there was no deliberate failure to learn what was happening in the Rosenbaum household. Fourth, Plaintiffs claim Warner should have known that White did not undress Laila. The record, as discussed above, only shows White did not undress Laila on two visits, the pre-placement visit and the visit after MP hurt her head. Warner did not learn of White's failure to undress Laila during the pre-placement visit until after the girl's death. (Dkt. 42-2 at 71:8–24.) And Warner stopped supervising White on November 1, 2015, before Defendant White learned of MP's black eye. The parties thus agree Warner did not know about that event. (Dkt. 41-2 ¶ 34.)

Plaintiffs have not shown Warner was deliberately indifferent to Laila's safety.

### 2. Procedural Due Process Claims

Plaintiffs allege Warner and White violated Laila's procedural due process rights. They claim Laila had a liberty interest in her own personal safety and White and Warner deprived her of her personal safety without due process by placing her with the Rosenbaums.

In a procedural due process claim, the alleged wrong is not the state actor's deprivation of a person's constitutionally protected interest. It is

the deprivation of that interest *without due process of law*. *See Zimmerman v. Burch*, 494 U.S. 113, 126 (1990). Such a cause of action arises, not when one suffers the deprivation of a constitutional right, but when the state actor fails to provide due process. *Id.* Thus a procedural due process claim arises "only when the state refuses to provide a process sufficient to remedy the procedural deprivation." *Cotton v. Jackson*, 216 F.3d 1328, 1330–31 (11th Cir. 2000).

The Eleventh Circuit found in *Taylor v. Ledbetter,* 818 F.2d 791, 794 (11th Cir. 1987), that a foster child can bring a procedural due process claim for the deprivation of a liberty interest in personal safety. After that decision, however, the Georgia General Assembly passed the Georgia Tort Claims Act ("GTCA"), which permits a child to sue state actors for certain conduct. By doing this, the State of Georgia makes a process available to those claiming a deprivation of their constitutional right, including to a child asserting a deprivation of his or her liberty interest in personal safety. In other words, the state provides "process." Georgia may satisfy its procedural due process obligations through a post-deprivation remedy. Indeed, the Supreme Court has held that "when a state official's random and unauthorized actions deprive a

person of a liberty interest protected by the Fourteenth Amendment, a state may satisfy its procedural due process obligations by providing an adequate post-deprivation remedy." *See McCall v. Dep't of Human Res.*, 176 F. Supp. 2d 1355, 1369 (M.D. Ga. 2001) (citing *Hudson v. Palmer*, 468 U.S. 517, 530–33 (1984).)

Plaintiffs allege White and Warner were deliberately indifferent to Laila's safety. Assuming White's and Warner's actions deprived Laila of her procedural due process rights, their actions were random and unauthorized. *McCall*, 176 F. Supp. at 1369 ("Indeed, it is inconceivable that the state would authorize its officials to violate a foster child's constitutional rights or that the state could foresee that they would do so absent any prior suggestive conduct."). The GTCA provides an adequate post-deprivation process for this alleged misconduct. *Id.* ("Essentially, there was no procedural due process violation in this case because the availability of relief under the GTCA means that any potential violation was not complete.").

Plaintiffs argue that the GTCA does not provide an adequate post-deprivation procedure because it does not provide a remedy if the jury finds Laila's death happened as the result of a battery. But "the

adequacy of the GTCA is not affected by the possibility that [defendants] may be entitled to state-law immunity." *McCall*, 176 F. Supp. 2d at 1369–70 n.6 (citing *Rittenhouse v. DeKalb Cty.*, 764 F.2d 1451, 1457–59 (11th Cir. 1985)). Plaintiffs' procedural due process claim thus fails.

The Court grants Defendant White's and Defendant Warner's Motions for Summary Judgment as to Counts 3 and 4.

## B. Defendant DHS's Motion to Dismiss or for Summary Judgment on Count Two[11]

Plaintiffs assert claims in Count Two against Defendant DHS for the alleged negligence of Warner and White in placing Laila with the Rosenbaums. They claim Warner and White negligently (and in violation of several ministerial duties) placed Laila and MP into the Rosenbaum's custody making DHS responsible for the injuries the Rosenbaum's inflicted on the two girls. (Dkt. 37 ¶¶ 58–66.) DHS moved to dismiss or for summary judgment on Count One based on sovereign immunity. (Dkt. 44-1 at 7.)

_____

[11] In the light of a jury's finding that Jennifer Rosenbaum and Joseph Rosenbaum are guilty of murder, the Court asked the parties for further briefing on any potential issues of preclusion or claim preclusion. (Dkt. 77.) The parties agree that neither doctrine applies here. (Dkts. 78; 79.)

The GTCA provides a limited waiver of the state's sovereign immunity, allowing aggrieved people to sue the State of Georgia for torts committed by state officers and employees acting within the scope of their official duties or employment. *See* GA. CODE ANN. § 50-21-23 ("The State waives its sovereign immunity for the torts of state officers and employees while acting within the scope of their official duties or employment . . . ."). There are, however, enumerated exceptions to this waiver. *See* § 50-21-24. One exception provides that the state is not liable for losses resulting from an assault and battery. *Id.* § 50-21-24(7). An assault and battery is "[a]ny act of physical violence (and the law will not draw a line between different degrees of violence), inflicted on the person of another, which is not necessary, is not privileged, and which constitutes a harmful or offensive contact . . . ." *Brown v. Super Discount Mkts., Inc.*, 477 S.E. 839, 841 (Ga. Ct. App. 1996). An offensive contact is one that results from anger, lust, or rudeness. *See Newsome v. Cooper-Wiss, Inc.*, 347 S.E.2d 619, 621 (Ga. Ct. App. 1986).

It makes no difference that Plaintiffs have sued DHS to recover for Warner's and White's negligence rather than for an assault and battery by the Rosenbaums. The exception is written in the passive voice — the

state is not liable for losses arising from an assault and battery. The Georgia Court of Appeals has stated that, in determining whether the exception for assault and battery applies, a court must look to the act causing the actual underlying loss to the plaintiff, not the state actor's alleged misconduct. *See Pelham v. Bd. of Regents of Univ. Sys. of Ga.*, 743 S.E.2d 469, 473 (Ga. Ct. App. 2013). "[I]f a plaintiff's injury was caused by an assault and battery committed by a third party, the state is immune from suit even if the assault and battery was facilitated by or resulted from the prior negligent performance of a state officer or employee." *Id.* Recognizing this law, the parties agree that "if the death resulted from an assault or battery, the GTCA would not apply and DHS would have no liability." (Dkt. 48 at 6).

The autopsy report concluded that Laila died from blunt impact injuries to her torso that "reflect inflicted trauma." (Dkt. 44-5 ¶ 19.) Jennifer Rosenbaum stated that Laila was choking on a chicken tender and she hit her on the back and performed the Heimlich maneuver to dislodge the food. (Dkt. 42-1 at 24:19–25:12.) Construing the facts in Plaintiffs' favor, a jury could conclude Jennifer Rosenbaum was trying to save the girl, justifying what she did.

Justification is a defense to an intentional tort. *See* GA. CODE ANN. § 51-11-1 ("If the defendant in a tort action was authorized to do the act complained of, he may plead such authorization as justification."). As Laila's guardian, Jennifer Rosenbaum had a duty to look after Laila. Her duty was to care for Laila as would "the average parent." *Le Petite Acad., Inc. v. Turner*, 543 S.E.2d 393, 361 (Ga. Ct. App. 2000) ("The standard of care is that of the average parent."). Jennifer Rosenbaum thus had the duty "to exercise care which a prudent person would exercise under like circumstances." *Id.* at 361–62. A jury could find that a prudent person, or an average parent, would seek a method of care for a baby they knew to be choking. Of course, Jennifer Rosenbaum's actions killed Laila, the autopsy records show that her body was battered and beaten. Perhaps a jury will reject her allegations, finding the beating totally inconsistent with a parent's efforts to help a child. But perhaps the jury will find that she was trying to save the child and administered aid too forcefully but only in a negligent manner. If so, Laila did not die as the result of an assault and battery. That is an issue for the jury.

Defendant DHS makes three arguments against this analysis. First, it argues that, absent an assault and battery, Plaintiffs can identify

no tort on which to bring a claim.  This argument overlooks the possibility that a jury could find that Jennifer Rosenbaum negligently performed the Heimlich maneuver.  In that case, the state would be responsible for her negligence.

Second, Defendant DHS argues the only evidence suggesting Jennifer Rosenbaum believed the girl to be choking (Jennifer Rosenbaum's own claim) is inadmissible hearsay.  But Jennifer Rosenbaum's 911 phone call may be admissible as an excited utterance. So might her statements to Defendant White in the moments following the event.  Since this evidence could be admissible, the Court may consider it here.  *See Macuba v. Deboer*, 193 F.3d 1316, 1323 (11th Cir. 1999) ("[A] district court may consider a hearsay statement in passing on a motion for summary judgment if the statement could be 'reduced to admissible evidence at trial' or 'reduced to admissible form.' ").

Third, Defendant argues the Heimlich maneuver was excessive force, making it an assault and battery by law.  Defendant cites *Brown* v. *Super Discount Mkts., Inc.*, for the proposition that excessive force is an assault and battery.  477 S.E. 839.  In *Brown*, a case in which a security guard detained two alleged shoplifters, the court reversed the grant of

summary judgment, finding there was an issue of material fact on whether there was false imprisonment or an assault and battery. *Id.* at 840–41. *Brown* did not hold that excessive force is an assault and battery. It held, rather, that unlawful touching is a tort. *See id.* If Jennifer Rosenbaum's actions were justified, they would be lawful. And whether the Heimlich maneuver was excessive force is a jury question.

A jury question remains about whether the assault-and-battery exception to Georgia's waiver of sovereign immunity applies. The Court denies Defendant DHS's Motion to Dismiss or Motion for Summary Judgment as to Count Two.

## C. Defendant DHS's Motion to Dismiss or for Summary Judgment Summary Judgment on Count One

In Count One, Plaintiffs asserts a claim under the GTCA against Defendant DHS for the alleged negligence of the Rosenbaums. DHS says the Court should grant its motion to dismiss or for summary judgment on this claim because Jennifer Rosenbaum was not a state officer or employee under the GTCA.

As explained above, the State of Georgia has a waiver of sovereign immunity for torts by state officers and employees acting within the scope of their official duties or employment. *See* GA. CODE ANN. § 50-21-23(a).

Waivers of sovereign immunity must be explicit. *See Gilbert v. Richardson*, 452 S.E.2d 476, 480 (Ga. 1994) ("[S]overeign immunity is waived by any legislative act which specifically provides that sovereign immunity is waived and the extent of such waiver."); *see also Johnson v. Ga. Dep't of Human Res.*, 606 S.E.2d 270, 273 (Ga. 2004) ("If liability without fault should be imposed on the taxpayers in circumstances of the kind presented by the record, this should be effected by the legislature, not the courts." (quotation marks and citation omitted)). The GTCA includes foster parents as state officers or employees. *See* § 50-21-22(7) ("An employee shall also include foster parents and foster children."). Plaintiffs contend the Rosenbaums were foster parents within the definition of Section 50-21-22(7), and the State has thus waived sovereign immunity for their actions.

The statute cited by Plaintiffs does not define "foster parents" under Georgia law. When applying the GTCA in a similar case, the Georgia Supreme Court looked to another statute and defined "foster parent" as "the person or persons who provide care, lodging, supervision, and maintenance in a foster care home used by a child-placing agency." *See Johnson*, 606 S.E.2d at 272 (citing GA. CODE ANN. § 49-5-60)). The

Georgia Code also defines a "foster care home" as "a private home used by a child-placing agency . . . to provide 24-hour care, lodging, supervision, and maintenance for no more than six children who are unrelated to the foster parent or parents." § 49-5-60(10). The Georgia Supreme Court did the same. *Johnson,* 606 S.E.2d at 273. Both definitions rely on action by a "child-placing agency." Georgia law states that all child welfare agencies — include child-placing agencies — must be are licensed and commissioned by the Department of Human Services, and must be approved "with procedures, standards, rules, and regulations to be established by the board." § 49-5-12(b). "A license issued to a child-placing agency shall be deemed approval of all foster family homes approved, supervised, and used by the licensed child-placing agency as a part of its work . . . ." *Id.*

DHS did not designate the Rosenbaums as foster parents to Laila and MP. DHS allowed them to take custody of Laila and MP as fictive kin. No child-placing agency was involved in the decision to place Laila and MP with the Rosenbaums. Defendants White and Warner hired a third party to conduct a background check of the Rosenbaums. But no evidence suggests that group was a "child-placing agency" under Georgia

Code Section 49-5-12(b). Since Laila and MP were not placed with the Rosenbaums by a licensed child-placing agency but were placed with them as fictive kin, the Rosenbaums were not "foster parents" within the definition of Section 49-5-60(10).

Georgia law recognizes at least seven types of foster care placements: (1) non-custodial parents, (2) relatives, (3) DFCS foster parents, (4) a Child Placement Agency's foster parents, (5) a Child Caring Institution, (6) a Psychiatric Residential Treatment Facility, and (7) fictive kin. (Dkt. 44-2 at 7–8.) This categorization also supports the conclusion that fictive kin are not foster parents. The GTCA only includes foster parents within its definition of state employees. *See Johnson*, 606 S.E.2d at 272 (finding foster care organization is not foster parent and thus not a state employee under GTCA). Since the GTCA does not explicitly name fictive kin as state employees, the Rosenbaums are not state employees. The State of Georgia has not waived sovereign immunity on their actions.

Plaintiffs argue this finding blue pencils an exception into the statutory definition of "foster child." Plaintiffs also claim the Rosenbaums were foster parents because "they [were] caring for non-

family members in their own home." (Dkt. 48 at 13.) The Court rejects these arguments for two reasons. First, a child-placing agency does not place fictive kin, at least here. Fictive kin thus do not fit into the definition of "foster parent." Second, sovereign immunity waivers must be explicit. In finding fictive kin to not be foster parents, the Court thus hems tightly to the Georgia Code's definition of "foster parents."

As explained above, the State of Georgia had a responsibility to protect Laila once it took her into its custody. The Court recognizes the potential absurdity of allowing state actors to assume control over a two-year-old girl, make every decision about her placement, place her in an abusive situation, and then escape liability for her injury, suffering, and death because it chose to go the route of fictive kin. But the State of Georgia decides the scope of its waiver of sovereign immunity, and this Court cannot expand it. The Court dismisses Count One of the Amended Complaint.

### C. Motion to Stay Ruling on Pending Motions and Motion to Reopen Record; Motion for Hearing

Jennifer and Joseph Rosenbaum's criminal trial recently ended. Plaintiffs argue that evidence emerged during the trial that will impact the Court's ruling here. Plaintiffs point to the acting director of the

Henry County DFCS office's testimony that victims of abuse cannot be foster parents.  (Dkt. 74 ¶ 1.)  Plaintiffs also highlight the extent of the medical record showing Laila Daniel's injuries.  (*Id.* ¶ 2.)  The Court acknowledges the weight of this evidence.  Even considering this evidence, however, the Court's ruling would not change.  The Court has already considered the failure to perform an adequate background check of Jennifer Rosenbaum.  The Court has also already considered the terrible injuries that Laila Daniel suffered.  The Court denies the Motion to Stay the Ruling and the Motion to Reopen the Record.  The Court also finds that a hearing is not needed and denies Plaintiff's Motion for a Hearing.

## IV.   Conclusion

The Court **GRANTS** Defendant Tamara Warner's and Defendant Samantha White's Motions for Summary Judgment (Dkts. 41; 43).  The Court **GRANTS IN PART** and **DENIES IN PART** Defendant Georgia Department of Human Services's Motion for Summary Judgment (Dkt. 44), and **DISMISSES** Count I of the Amended Complaint (Dkt. 37).  The Court **DENIES** Plaintiffs Anthony Daniel's and Tessa Clendening's

Motion for a Hearing (Dkt. 71) and Motion to Stay the Proceedings and Reopen the Record (Dkt. 74).

**SO ORDERED** this 15th day of November, 2019.

_____
MICHAEL L. BROWN
UNITED STATES DISTRICT JUDGE